FILED

APR 10 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RHONDA FLEMING

V.                        NO. 23-CV-02149-YGR

T. JUSINO

LETTER BRIEF TO THE COURT ON THE STATUS OF FCI-DUBLIN

Dear Judge Gonzalez-Rogers:

Well, thanks for what you have been doing for the women at FCI-Dublin. In years of incarceration, I have never seen any judge help women in federal custody.

As I have previously stated, I have been beating the drum about sexual abuse of women in FBOP custody for a long time. In fact, after I was sexually assaulted at SFF-Hazelton, in 2018, I contact attorney Michael Bien, and attempted to get the Robin Lucas case reopened.

The FBOP is about to pull one of their usual tricks. The DOJ-FBOP will not allow their prisons to be monitored. So, they are going to close the prison for women and bring male inmates here. The signs are apparent to all of us.

The prison officials are processing as many inmates as they can for transfer to prison camps. Those women not eligible for prison camp will soon be transferred. Women at the Federal Transfer Center in Oklahoma who were designated to FCI-Dublin, have been told they are not coming here.

As for me, I have been told I will go to a prison camp. There is some joy in this because I will see my family, however, Judge Gonzalez-Rogers, I deserve to be transferred to home confinement. The FBOP will not do the right thing unless ordered to do so by a federal judge.

Frankly, I am not sadden about the prison closing for women. The reasons are as follows:

FCI-DUBLIN'S GEESE FECES PROBLEM IS DANGEROUS TO HUMANS

I don't believe the environmental conditions are safe for any human. Judge, you personally witnessed the geese feces all over the prison. So many inmates are ill with respiratory illnesses. Please see Exhibit-___A___, Information on Diseases from Geese Feces. I have not had a full 8 hours of sleep since I arrived at FCI-Dublin. Until I started reporting the dangerous conditions of the prison to OSHA and the EPA, nothing was being done about these geese.

On the day you toured the prison, an employee was attacked by two geese. She was injured and did not return to work for about a month. This is a daily occurrence at the prison.

I can report that the prison safety official picked up over 600 eggs to stop the prison compound from being overrun by the geese. We still have at least 25 new chicks, with more on the way. These geese multiple at higher rates than cats. I have seen 8 to 10 new chicks with one set of parents.

As you noted, the geese feces is everywhere. It is absolutely disgusting to try to go eat at Food Service, while walking through geese feces all over the prison compound.

It is in the ventilation system. It is all over our floors inside of the buildings. The prison officials have the women cleaning this dangerous substance without any safety training or protective gear. Praise God, it was not a dry, windy day when you came, or you would have been inhaling geese feces.

-1-

No one should be at FCI-Dublin until there is a solution for the environmental problem of the geese. Judge Gonzalez-Rogers, please do your own research on the dangers of geese feces. In some ways, it is more dangerous than black mold.

Today, as I looked out the windows with women and correctional staff, all we could see all over the compound were the geese and their feces. A correctional officer stated they have a hard time coming to work and parking because the geese have overrun the prison.

No one should be living like this or coming to work in such dangerous conditions.

THERE ARE SYSTEMIC PATTERNS OF FBOP EMPLOYEES' RETALIATION AGAINST WOMEN VICTIMS OF SEXUAL ASSAULT AND/OR RETALIATION AT OTHER PRISON LOCATIONS

At this time, you have before you a defendant, Darryl Smith who committed sexual crimes against probably 100 or more women, during the pandemic, which he used to commit his crime. He was a serial predator who the FBOP allowed to do whatever he wanted for years.

I never met him, but I had regular contact with his wife. How? Before I was transferred to FCI-Dublin, I was at FCI-Tallahassee, where the Smiths had relocated. Ms. Smith was my instructor for two classes I attended at FCI-Tallahassee.

I bring this situation to your attention as an example of how deeply embedded sexual abuse of women is part of the culture of the FBOP. No matter where the FBOP transfers women, we are subjected to the same individuals and their family members, sexually abusing us and/or retaliating against us.

At one prison camp where I was housed, I was sexually harassed by a BOP male officer. When a male visitor came to see me, that visitor was treated rudely by the officer. Later, I was questioned by the officer about my "relationship" with the visitor.

History has taught me, while in the FBOP, if I report sexual abuse I will be punished. So, if I am not sent to home confinement, I will be at another prison with the friends and/or family members of present and former FBOP employees.
When I was transferred in violation of your court order to MDC-Los Angeles, I saw two former FCI-Dublin employees at that facility. One of the employees was part of intimidating inmates to not report sexual abuse, with many complaints submitted to the prison investigators.

The Director of the FBOP, the U.S. Attorney's Offices throughout the country, and the FBI are well aware of the systemic problems with prison correctional staff sexually assaulting and/or harassing women. Prison transfers are not the answer. Women with documented, substantiated cases of sexual abuse and/or retaliation should be sent to home confinement, not to another prison for the same criminal acts to ensue, again.

Judge Gonzalez-Rogers, please consider the Michigan Department of Corrections (MDOC) sexual abuse scandals. After a $100 million settlement with the women that were abused, the MDOC prevent male officers from having contact with women inmates. This decision was upheld by the U.S. Sixth Circuit of Appeals. However, as we know, where there is a will, there is a way. Sexual assault lawsuits against the MDOC are presently being litigated. Exhibit- _B_ & _C_, Excerpt of U.S. Sixth Circuit Decision and Excerpt of Recent Litigation on Sexual Assault of Women.

As for the State of New Jersey, they simply closed their women's prison. The Governor was appalled, but could come up with no other solution.

And prison transfers are not the solution. In many respects, these transfers are punishment. Women are transferred without their property. The prison officials at FCI-Dublin "might" forward our property in 3 or 4 months. In the meantime, if women have the resources, they are forced to re-purchase all the hygiene, clothing, and shoes at another prison. Our families have to pay the cost of these prison transfers.

I have no solution to any of these very serious, seemingly unending, criminal conduct of some FBOP employees. I bring these issues to your attention because the Plaintiff attorneys have not live this nightmare. The Plaintiff attorneys, and even the USAO attorneys, are not aware of how sexual abuse is part of the FBOP prison culture, at ALL federal women's prisons.

The Department of Justice goes into other prisons to address sexual abuse, but they have not solved the problem in their own prisons.

Wherever federal women prisoners, victims of sexual assault and/or retaliation are transferred, they will be in danger, unless

they are transferred to home confinement or a halfway house.

ONGOING DENIAL OF HALFWAY HOUSE AND HOME CONFINEMENT TRANSFERS TO WOMEN AT FCI-DUBLIN

I am not the only woman who endured criminal civil rights violations, retaliation, by the senior prison officials. I was blessed in the situation, where 3 or more employees reported what was happening, and refused to harm me. Other women did not have anyone to support their claims.

Many of us were due transfers to halfway house and/or home confinement. Like me, some have filed claims in this district. Others did not have the know-how to do so. Many qualified for these transfers, are United States citizens, but their language barrier prevented them from receiving the transfers.

Transfers to home confinement were a success. Please see, Exhibit-__D__, News Article from Reuters on CARES Act Home Confinement Transfers, March 2024. Even Director Peters acknowledged the importance of this study.

The recent events of the wardens and others still at the prison have proven I suffered retaliation which stopped my transfer to home confinement. My family, specifically my parents, had their emotions played with by the prison officials at FCI-Dublin, so I did not suffer alone. My parents are 80 and 85. I praise God they are still alive. I also have an uncle that is 87, with dementia. My only sister is taking care of all three senior citizens. I am needed at home.

Other inmates are in the same situation, where they have minor children in crisis and their parents are suffering with medical problems, yet still raising these children. Judge Gonzalez-Rogers, when most women go to home confinement, most of us go home to care for children and/or parents.

I have spoke with investigators at the prison. They have acknowledged there was no merit to the claims made by the BOP as to why I was not transferred to home confinement, due to a "keep separate" or CIM classification.

As a sidenote, the only doctor at the prison is being investigated for falsifying our electronic medical records. Yet, the FBOP continues to do all they can to keep women in prisons, instead of utilizing home confinement.

CONCLUSION

Judge Gonzalez-Rogers, the women at FCI-Dublin and in other federal women's prisons know you care. That means a lot and has brought tears of relief to many women. Several of the women have asked me to thank you. They feel afraid or uncomfortable or unsure for them to express it themselves.

Respectfully Submitted,

Rhonda Fleming, Petitioner
April 6, 2024
FCI-Dublin
5701 8th Street
Dublin, CA 94568

CERTIFICATE OF SERVICE

Service is performed by the electronic filing of this document by the U.S. Clerk, and by email forwarding to AUSA Michael Keough, at: michael.keough@usdoj.gov.

Rhonda Fleming, Petitioner

Geese feces can contain harmful bacteria and parasites that can cause respiratory infections and diseases. When these feces are inhaled, the bacteria and parasites can enter the respiratory system and cause inflammation and irritation. This can lead to symptoms such as coughing, wheezing, and difficulty breathing. In severe cases, it can even lead to pneumonia or other serious respiratory illnesses. Additionally, the strong smell of geese feces can also trigger respiratory allergies and asthma in some individuals.

Bird fancier's lung, also known as avian hypersensitivity pneumonitis, is a type of lung disease that is caused by exposure to bird droppings, feathers, and other organic material from birds. It is an allergic reaction that occurs when a person inhales these substances, leading to inflammation and scarring in the lungs. This condition is most commonly seen in people who keep birds as pets or work with birds, such as bird breeders, zookeepers, and poultry farmers. Symptoms may include coughing, shortness of breath, chest tightness, and fatigue. Treatment typically involves avoiding exposure to birds and using medications to manage symptoms.

Histoplasmosis is a fungal infection caused by the inhalation of spores from the Histoplasma capsulatum fungus. It is commonly found in soil and bird or bat droppings, and can be contracted by breathing in the spores. The infection can range from mild flu-like symptoms to severe respiratory illness and can affect different parts of the body, including the lungs, skin, and other organs. It is most commonly found in areas with warm, humid climates, and is not usually contagious between humans. In most cases, histoplasmosis can be treated with antifungal medication.

Psittacosis, also known as parrot fever or chlamydiosis, is a bacterial infection caused by the bacterium Chlamydia psittaci. It primarily affects birds, including parrots, cockatiels, and pigeons, but can also be transmitted to humans through contact with infected birds, their droppings, or contaminated dust. Symptoms in humans can range from mild flu-like symptoms to severe pneumonia, and the infection can be treated with antibiotics. Proper hygiene and handling of birds can help prevent the spread of psittacosis..

EX-A-1

---

The Real Safety and Health Risks of Bird Droppings
Posted by Bird Barrier on Feb 15, 2021 11:30:00 AM

There's something both cheerful and calming about the presence of birds and their song. People even dedicate their free hours and passion to seeking, watching, and photographing birds in their natural habitats. The keywords here, however, are natural habitats. Though birds are delightful in the wild, it's best to keep them at bay when it comes to your home or commercial property. Birds and their droppings can actually cause a variety of different health risks, some with the potential to become deadly. They can also cause substantial property damage and liability issues for commercial facilities. This article explores the property damage and health risks of bird droppings.

Health Risks of Bird Droppings
Birds may seem harmless enough, but a deeper dive into the health risks associated with their droppings is rather alarming. Birds have been associated with over 60 different diseases, and that's not even accounting for the avian flu. These different diseases are most concerning in residential areas, where birds gather in large flocks and can be difficult to deter. The diseases spread by their waste can become airborne, transferring to humans just by being in the same vicinity as the droppings. The main transmittable bird diseases are:

Histoplasmosis
This is a respiratory disease that can become fatal. If you are immunocompromised, your risk is much higher. This derives from a fungus that grows in old bird droppings, as well as through airborne fungus spores from the soil. This is especially concerning if a bird roosts at your property, as the soil under their roost can become enriched by the disease organism. The National Institute of Health has also linked a potentially blinding eye condition to this fungus.

Candidiasis
This is a yeast or fungal infection that is spread through pigeons specifically. This disease can affect many areas of the body, including the respiratory system, intestines, and reproductive system. Candidiasis has been linked to death on more than one occasion. Your health risk from bird droppings if you're immunocompromised is much greater.

Cryptococcosis
It is caused by a yeast found in the intestinal tracts of common birds. This is acquired by inhaling the cells of the organism, which is again more common in areas where a bird is roosting.

Psittacosis
This is caused by a bacterium inhaled from bird droppings. Though it usually only leads to minor flu-like symptoms, it can develop into pneumonia and require hospitalization. OSHA has actually released a bulletin due to concerns from this health risk due to bird droppings.

St. Louis Encephalitis
This causes an inflammation of your nervous system that often leads to drowsiness and fever, but sometimes paralysis or even

a coma can occur. This actually spreads from mosquitoes that have fed on infected birds. This is yet another reason why keeping birds away from your property is a good idea.

E.coli

This bacteria can exist in cow manure and spreads when birds peck at the manure. It is released from their droppings, which can become a problem if they land in a food or water supply.

Salmonellosis

You've likely heard of this occurring and causing food poisoning. But it can actually link back to bird droppings. It presents a serious health risk.

Bird Droppings and Ectoparasites

As was mentioned with St. Louis encephalitis, the direct health risks of bird droppings are not the only problem. When another pest feeds on a bird with a disease, the pest can then spread the disease to humans. This commonly happens with:

- Bed bugs
- Chicken mites
- Mosquitos
- Yellow mealworms

Birds Droppings and Residential Property Damage

The health risks of bird droppings are not the only concerns, either. Birds and bird droppings can actually cause extensive damage to your property. Much of this damage is due to the fact that bird droppings contain uric acid, which has a pH level of around 3.5 to 4. This can eat through a surprising number of building materials. The list includes tar-based roofing, creating leaks. This also includes stone, metal, and siding.

Additionally, their nests are a huge problem. The materials they use can quickly become a fire hazard, clog up gutters or drainage pipes and cause water damage, and even block up ventilation systems and create further health hazards. You want to keep birds from nesting within your home, and you can do this with the proper deterrents.

Automobile Damage

It's also worth mentioning the damage birds can do to your car. Americans already spend hundreds of dollars a year on car maintenance. This can quickly be undone, at least aesthetically, due to bird droppings, as they can actually warp the surface of your car's clear coat. This happens when the bird droppings dry, leaving an imprint that distorts the texture of the underlying finish. This damage can be permanent. The fewer bird droppings that end up on your car, the better.

Bird Droppings and Damage to Commercial Properties

Commercial properties are obviously larger, and birds are like other animals in the sense that they are drawn to the scent of their droppings. This can create a big problem, as more and more birds flock to the same general area. Bird droppings cause millions of dollars of damage every year to machinery, roofs, and ventilation systems. This puts your air conditioning and heating units, rooftops, and most other building materials at risk. Bird droppings cause the same damage to commercial properties as they do to residential, just at an even larger scale.

In buildings with automatic doors, they are also prone to getting inside. This creates damage to the internal structure and anything inside. It also becomes a huge nuisance to remove them. Another concern with commercial properties is the potential liabilities from slips and falls, which we cover next.

Bird Droppings and OSHA

Birds and their droppings can truly create unsafe work environments. First, the droppings can be slippery, and employees or customers could fall. The droppings do not just create a messy and dirty environment; they can be a real hazard. In a worst-case scenario, a fall at your property could create a lawsuit and a subsequent expensive settlement. The health hazards of bird droppings previously discussed can also cause a significant issue for commercial properties. For instance, a teacher in Florida won a $1.2 million settlement when he contracted a disease from bird droppings when working at a school.

Birds are treasured and protected creatures. But that doesn't mean you have to put up with them invading your residential or commercial properties. Considering their droppings are linked to over 60 different diseases and potentially serious health risks, along with causing substantial property damage, keeping them at bay is truly your best option. Contact us today for long-term solutions to invading birds and the associated health risks of bird droppings.

About Bird Barrier

Bird Barrier is a leader in innovative technology designed to prevent birds from landing, roosting or nesting. We specialize in urban bird control to remove birds humanely and effectively. Our website, birdbarrier.com, hosts a wealth of content to help people understand and identify bird control solutions for various problems with pest birds. Please contact us if you need help with a bird related problem. You may also benefit from our free guide, Bird Deterrents: The Complete Guide.

Topics/Tags/Categories: Pigeons, Building Damage, Bird Droppings, Health Risks, Diseases

About Us

At Bird Barrier® we realize that you, our customers, are our most important asset. We'll always do our best to promptly meet your needs whether it's helping you identify the best solution or answering your questions about our products and how to use them. We enjoy hearing from you, so please feel free to contact us. Se habla Español.

EX-A-2

ROSLYN EVERSON; RANDY FOX; STENNIS GEORGE; BRENDA L. SEBASTIAN, and a class of all persons similarly situated, Plaintiffs-Appellees, v. MICHIGAN DEPARTMENT OF CORRECTIONS; BILL MARTIN, individually and in his official capacity as Director of the Michigan Department of Corrections, Defendants-Appellants (02-2033), LINDA NUNN; TRACY NEAL, Intervening Defendants-Appellants (02-2028/2084).
UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
391 F.3d 737; 2004 U.S. App. LEXIS 24905; 2004 FED App. 0418P (6th Cir.); 94 Fair Empl. Prac. Cas. (BNA) 1542; 86 Empl. Prac. Dec. (CCH) P41,900
04a0418p.06Nos. 02-2028/2033/2084
December 3, 2004, Decided
February 4, 2004, Argued
December 3, 2004, Filed

**Editorial Information: Subsequent History**

Rehearing denied by, Rehearing, en banc, denied by Everson v. Mich. Dep't of Corr., 2005 U.S. App. LEXIS 4653 (6th Cir., Mar. 18, 2005)US Supreme Court certiorari denied by Everson v. Mi Doc, 2005 U.S. LEXIS 6089 (U.S., Oct. 3, 2005)

**Editorial Information: Prior History**

{2004 U.S. App. LEXIS 1} Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 00-73133--Avern Cohn, District Judge. Everson v. Mich. Dep't of Corr., 222 F. Supp. 2d 864, 2002 U.S. Dist. LEXIS 12544 ( E.D. Mich., 2002)

**Disposition:**
Reversed and remanded.

**Counsel** ARGUED: Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, Mark W. Matus, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants.
John R. Runyan, SACHS WALDMAN, Detroit, Michigan, for Appellees.
ON BRIEF: Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, Mark W. Matus, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants.
John R. Runyan, Eileen Nowikowski, Marshall J. Widick, SACHS WALDMAN, Detroit, Michigan, for Appellees.

**Judges:** Before: NORRIS, GILMAN, and ROGERS, Circuit Judges. ROGERS, J., delivered the opinion of the court, in which NORRIS, J., joined. GILMAN, J. (pp. 20-21), delivered a separate dissenting opinion.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellants, the Michigan Department of Corrections (MDOC) and its director, barred males from working in certain positions in female prisons. Plaintiff MDOC employees sued the MDOC, alleging that the MDOC's plan violated Title VII of the Civil Rights Act of 1964 and

A06CASES 1

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EX-B-1

20446009

Michigan's Elliott-Larsen Civil Rights Act. The United States District Court for the Eastern District of Michigan at Detroit ruled in the MDOC employees' favor. The MDOC appealed. The female gender was a bona fide occupation qualification for the positions in housing units at female prisons because department of corrections' plan would enhance security and decrease the likelihood of sexual abuse by male guards at the prisons.

**OVERVIEW:** After several lawsuits by female prisoners alleging rampant sexual abuse of female prisoners by male guards, the director of the MDOC designated some 250 positions in housing units at female prisons as female only, but the trial court disagreed finding that gender was not a bona fide occupation qualification (BFOQ) and that the MDOC's plan violated Title VII and state law. The MDOC conceded that it adopted a facially discriminatory plan; thus, the case turned on whether such overt disparate treatment was for some reason justified under Title VII. The appellate court found that the female gender was a BFOQ for the positions in housing units at female prisons because (1) the MDOC's plan would significantly enhance security at the facilities; (2) the MDOC had established that the exclusion of males from the housing units would decrease the likelihood of sexual abuse; (3) the MDOC made a reasonable determination that its plan would protect the female inmates' privacy rights; (4) the trial court erred in finding that there were reasonable alternatives to the MDOC's plan; (5) the trial court erred by not giving the appropriate deference to the reasoned decisions of the MDOC director.

**OUTCOME:** The appellate court reversed the trial court's judgment and remanded the case to the trial court for further proceedings.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EX-B-2

20446009

The problem of **sexual abuse** 2 and other mistreatment of female inmates has long plagued the **MDOC**. In 1993, following interviews of a number of inmates, the Michigan Women's Commission 3 advised the **MDOC** that it believed that "sexual assault and harassment are not isolated incidents and that fear of reporting such incidents is a{2004 U.S. App. LEXIS 6} significant problem." In 1996, after an independent investigation, Human Rights Watch issued a report concluding that "rape, sexual assault or abuse, criminal sexual contact, and other misconduct by corrections staff are continuing and serious problems within the women's prisons in Michigan [and] have been tolerated over the years at both the institutional and departmental levels." 4 Human Rights Watch also charged that the male corrections staff routinely violated the privacy rights of inmates by, for example, abusing their power to conduct "pat-down" searches and improperly viewing inmates as they used the shower or toilet. Later, in 1998, Human Rights Watch issued a second report describing a campaign of retaliation by corrections staff against several **women** who had made public accusations of **sexual abuse**. In 1999, following its own investigation, the United Nations Commission on Human Rights seconded Human Rights Watch's charge that corrections officers systematically retaliated against **women** who reported **sexual abuse**.

Statistics compiled by the parties add some content to the charge of rampant **sexual abuse** of female inmates in Michigan's prisons. According to the **MDOC**, between 1994 and January 31, 2001, it investigated 217 allegations of sexual misconduct 5 {391 F.3d 742} against female inmates, of which 43 were sustained and of which only 47 were deemed unfounded. According to the plaintiffs' calculations, between 1994 and 2000, female inmates made 208 allegations of sexual misconduct, of which 58 were sustained or resulted in the resignation, leave, or discharge of the accused. In 1997 and 1998, Michigan cases constituted 10 out of a total of 20 convictions of male staff nationwide for criminal sexual conduct against **women** prisoners.

{2004 U.S. App. LEXIS 8} In addition to public criticism, the **MDOC** faced a pair of high-profile lawsuits involving the **sexual abuse** of female inmates 6 in this period. On March 27, 1996, a group of female inmates filed suit in the United States District Court for the Eastern District of Michigan against the **MDOC** and a number of state officials and corrections officers (the "*Nunn* lawsuit"). The inmates alleged rampant sexual misconduct, sexual harassment, violation of privacy rights, and retaliation by corrections officers, and they asserted violations of the First, Fourth, Eighth, Ninth, and Fourteenth Amendments under 42 U.S.C. § 1983, and of the Violence Against **Women** Act, 42 U.S.C. § 13981. The inmates' monetary claims were settled for a little less than $ 4 million, and, on July 31, 2000, the inmates' claim for injunctive relief was resolved by a settlement agreement (the "*Nunn* agreement"). In the *Nunn* agreement, the **MDOC** pledged, among other things, to restrict pat-down searches of female inmates by male staff, to require male staff to announce their presence upon entering a housing unit area, and to maintain areas where inmates{2004 U.S. App. LEXIS 9} may dress, shower, and use the toilet without being observed by male staff. Additionally, the *Nunn* agreement provided that "consistent with the MDOC's announced intention to limit the assignment of staff in facility housing units to female officers, the **MDOC** will make a good faith effort to accomplish this objective." 7

{2004 U.S. App. LEXIS 10} In June of 1994, the Civil Rights Division of the United States Department of Justice (the "DOJ") initiated an investigation of allegations of **sexual abuse** and other violations of the constitutional rights of inmates at a pair of Michigan women's prisons pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* The State refused to grant the DOJ access to the facilities, but the DOJ managed to interview over 100 inmates in the course of its investigation. By a letter dated March 27, 1995, the DOJ advised the Governor of Michigan that it {391 F.3d 743} had concluded that "various acts, practices, and other conditions at both facilities

A06CASES                                   1

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EX- B-3

20446009

deny inmates confined there of their constitutional rights." The DOJ found that "**sexual abuse** of **women** inmates by guards, including rapes, the lack of adequate medical care, including mental health services, grossly deficient sanitation, crowding, and other threats to the physical safety and well-being of inmates violates their constitutional rights." The DOJ letter reported a pattern of **sexual abuse**, including sexual assaults by guards, "frequent" sexual activity between guards and inmates, sexually aggressive{**2004 U.S. App. LEXIS 11**} acts by guards (such as pressing their bodies against inmates, exposing their genitals to inmates, and fondling inmates during "pat-down" searches), and ubiquitous sexually suggestive comments by guards. The DOJ letter also detailed improper visual surveillance of inmates, including the "routine" practices of watching inmates undress, use the shower, and use the toilet.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EX-B-4

20446009

CHRISTINE BEAUSOLEIL and JUDITH SCHOLL, Plaintiffs, v. RICK SNYDER, HEIDI
WASHINGTON, KENNETH MCKEE, BRUCE CURTIS, STEVE RIVARD, LLOYD RAPELJE,
ANTHONY STEWART, SHAWN BREWER, TONI MOORE, and NORMAN LAUGHLIN, Defendants.
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN
DIVISION
2021 U.S. Dist. LEXIS 29234
Case No. 18-13139
February 17, 2021, Decided
February 17, 2021, Filed

**Counsel** {2021 U.S. Dist. LEXIS 1}For Christine Beausoleil, Judith Scholl, Plaintiffs: Elizabeth Ann Marzotto Taylor, Deborah Gordon Law, Bloomfield Hills, MI; Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI.
For Shawn Brewer, Anthony Stewart, Toni Moore, Defendants: Kristin M. Heyse, LEAD ATTORNEY, Michigan Department of the Attorney General, Lansing, MI; Kevin J. O'Dowd, Michigan Dept of Attorney General, Lansing, MI.
For Norman Laughlin, Defendant: Guy T. Conti, ContiLegal, Ann Arbor, MI.
**Judges:** Honorable LAURIE J. MICHELSON, UNITED STATES DISTRICT JUDGE.

Opinion

**Opinion by:** LAURIE J. MICHELSON

Opinion

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [57]

This case involves upsetting facts. Christine Beausoleil and Judith Scholl were sentenced to relatively short prison terms and yet, during their stay at the Women's Huron Valley Correctional Facility (WHV), they were repeatedly sexually assaulted by a staff person there, Norman Laughlin.

This case also involves the challenging task of deciding who, aside from Laughlin, is responsible for the abuse. The abuse occurred in a warehouse at WHV, and Plaintiffs Beausoleil and Scholl have sued Toni Moore who supervised warehouse operations at WHV.{2021 U.S. Dist. LEXIS 2} They have also sued the two WHV Wardens during their sentences, Anthony Stewart and Shawn Brewer. In addition, Plaintiffs have sued higher-level people in the Michigan Department of Corrections, including the MDOC's Director, Heidi Washington. In Beausoleil's and Scholl's view, all of these people were deliberately indifferent to Laughlin's abuse, and thus violated their rights under the Eighth Amendment. Given that assertion, this case involves determining what each defendant knew about Laughlin's proclivities, and when they knew about it.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EX-C-1

20446009

FROM: Goodwill, Michael
TO: 20446009
SUBJECT: Bureau Of Prisons Releases Encouraging Study On CARES Act
DATE: 03/31/2024 11:06:02 PM

EX-D-1

Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) on March 25, 2020 just as the pandemic reached the United States. CARES Act allowed individuals in federal correctional facilities who were a Low or Minimum security risk with underlying health conditions to serve their sentence in home confinement earlier than they would have been eligible for without the CARES Act.

Prior to the CARES Act, the Federal Bureau of Prisons (BOP) allowed inmates to serve 10% of their sentence imposed, up to a maximum of 6 months, on home confinement as part of completing their sentence. This program too is a success and allows inmates of all security levels to transition back into society. Many of those in federal custody, about 90%, will eventually be released from custody. Transition back to society is an important part of the corrections process.

The BOP has now completed a study on the inmates who were transferred to home confinement under CARES Act and the results are encouraging. In a press release from the BOP, it stated, "These findings suggest that the CARES Act's provision for early and extended home confinement did not negatively impact recidivism rates. In fact, it may have contributed to a reduction in post-release recidivism, offering a promising direction for justice-involved stakeholders seeking effective strategies to reduce incarceration and its associated costs, while also promoting public safety and successful reintegration into society."

Home confinement has been part of an individual's prison term for decades but there are also other credits to reduce prison terms. Most inmates receive Good Conduct Time of 54 days for every year of the imposed sentence (Note: These days can be taken away for disciplinary infractions). In addition, the First Step act allows many Minimum and Low security inmates to earn up to a year off their sentence for participating in programming or productive activities. Now, with information from the CARES Act study, the BOP can have confidence that alternative means of incarceration can be used.

The BOP has the policies to move more Minimum and Low security inmates back into society sooner. Under the Second Chance Act, signed by George W. Bush, inmates can be placed on prerelease custody for up to a year of their sentence. Prerelease custody includes halfway house and home confinement. However, the BOP has struggled recently with halfway house capacity, leaving many of inmates in institutional prisons far longer than necessary. This problem of shortages of halfway house space is problematic because the First Step Act allows inmates to earn credits toward additional home confinement based on the time served. The maximum amount of time an inmate can earn each month is 15 days per month but there is no limit to the amount of credits that can be earned over the term of incarceration. This means that inmates in the future could be on home confinement for years.

BOP Director Colette S. Peters commented on the findings, "This study reinforces my belief, shaped by decades of experience in corrections, that alternatives to mass incarceration are the most effective approach. The findings that individuals with a CARES assignment recidivated no more or less than comparable people in home confinement, and even less often post-release, are encouraging. This study suggests that reducing incarceration for appropriate people through measures like early and extended home confinement does not compromise public safety and in fact, suggests it may contribute to successful reintegration into society."

The study found that overall, the use of the CARES Act to send individuals to home confinement sooner and for longer periods did not have an apparent negative impact on their recidivism rates compared to others in home confinement. Results indicate that while in home confinement individuals with a CARES assignment fail no more or less than comparable persons in home confinement. And those with a CARES assignment fail less often than comparable persons after release.

This study matters because there are currently 78,000 out of roughly 156,000 inmates who are minimum and low security inmates in federal prison. Supervision of inmates in home confinement is significantly less costly for the BOP than housing inmates in secure custody. According to a Federal Register report on the CARES Act, in Fiscal Year (FY) 2019, the cost of incarceration fee (COIF) for a Federal inmate in a Federal facility was $107.85 per day; in FY 2020, it was $120.59 per day.55 In contrast, according to the Bureau, an inmate in home confinement costs an average of $55 per day less than half of the cost of an inmate in secure custody in FY 2020. Although the BOP's decision to place an inmate in home confinement is based on many factors, where the BOP deems home confinement appropriate, that decision has the added benefit of reducing the expenditures. Such cost savings were among the intended benefits of the First Step Act.

The BOP intends to build on the information from this study and others on home confinement. Prisons remain crowded and many inmates are serving longer sentences in expensive institutions than are necessary. Home confinement, which is a major

benefit to both inmates and tax payers, is a big part of the First Step Act. Whether the BOP can fully implement the program to get inmates out of prisons and into the community faster remains a challenge.

The BOP has not had many good stories over the past 6 years but its use of home confinement under the CARES Act should embolden the agency to do even more with the policies that it has in place today.

"Believe you can and you're halfway there." Theodore Roosevelt

EX-D-2

Rhonda Fleming 20446-
Federal Correctional Ins
5701 8th Street
Dublin, CA 94568

Legal Mail

—009

titution



⇨20446-009⇦
Us District Court
1301 CLAY ST
Office of the Clerk
Oakland, CA 94612-9771
United States



20446-009
Us District Court
1301 CLAY ST
Office of the Clerk
Oakland, CA 94612-9771
United States

FEDERAL CORRECTIONAL INSTITUTION, DUBLIN
5701 8TH ST.
DUBLIN, CA 94568
DATE: 04-08-24

The enclosed letter was processed through special mail
procedures for forwarding to you. The letter has neither been
opened nor inspected. If the writer raises a question or problem
over which this facility has jurisdiction, you may wish to return
the material for further information or clarification. If the writer
encloses correspondence for forwarding to another address,
please return the enclosure to the above address.



BLIN

ling
een
oblem
eturn
riter
ssee,